(text box: 1) NO. 5-03-0101

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

DONNA CRUTHIS and STEVE CRUTHIS, )  Appeal from the

)  Circuit Court of

     Plaintiffs-Appellants and Cross-Appellees, )  Madison County.

)

v. )  No. 00-L-961

)   

FIRSTAR BANK, N.A., )  Honorable 

)  George J. Moran,

     Defendant-Appellee and Cross-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE HOPKINS delivered the opinion of the court:

The plaintiffs, Donna and Steve Cruthis, filed their complaint against the defendant, Firstar Bank, N.A., for, 
inter alia
, breach of contract, conversion, and consumer fraud (815 ILCS 505/1 
et seq.
 (West 2002)).  The trial court entered a directed verdict for the plaintiffs on their breach-of-contract claim.  The jury returned a verdict for the plaintiffs on their conversion claim and awarded them $33,682.80 in compensatory damages and $250,000 in punitive damages.  The trial court entered a judgment for the defendant on the plaintiffs' consumer fraud claim, and the court also entered in the defendant's favor a judgment notwithstanding the jury's verdict on the issue of punitive damages.

On appeal, the plaintiffs argue that the trial court erred in entering a judgment notwithstanding the verdict on the issue of punitive damages and in entering a judgment for the defendant on the plaintiffs' consumer fraud claim.  On cross-appeal, the defendant argues that it was entitled to a judgment notwithstanding the verdict on the plaintiffs' conversion claim, that the jury improperly assessed damages for emotional distress and for loss of use, that the trial court erred in instructing the jury, and that the trial court erred in granting a directed verdict for the plaintiffs on their breach-of-contract claim.

We affirm in part and reverse in part.

FACTS

In April 1992 the plaintiffs opened a checking account with the defendant's predecessor.  When they opened their account, the bank issued the plaintiffs an overdraft protection line of credit in the amount of $3,500.  The bank notified the plaintiffs that it would advance automatically the overdraft protection line of credit only when a check was presented for payment and the plaintiffs' checking account contained an insufficient balance.  Prior to September 5, 2000, the plaintiffs had never triggered the overdraft protection line of credit.

Donna's employer, May Company/Famous Barr (Famous Barr), through its bank account with Northern Trust Company (Northern Trust), deposited semimonthly payroll payments of approximately $947 into the plaintiffs' checking account on May 15, 2000, May 31, 2000, June 15, 2000,  June 30, 2000, July 15, 2000, July 31, 2000, and August 15, 2000.  In late August 2000, Famous Barr directed Northern Trust to retrieve these wage payments from the plaintiffs' account.  In a letter written to the defendant and dated August 24, 2000, Northern Trust confirmed its request for the return of the payroll deposits made to Donna between May 15, 2000, and August 15, 2000, advising the defendant that Donna's employment had been terminated on April 21, 2000.  Famous Barr had not terminated Donna on April 21, 2000.

The plaintiffs' account balance on September 1, 2000, was approximately $2,391.  On September 5, 2000, the defendant withdrew $5,682.80 from the plaintiffs' account and transferred the funds to Northern Trust.  The defendant depleted the plaintiffs' account, and the additional funds transferred to Northern Trust triggered the plaintiffs' overdraft protection line of credit.  Thereafter, four of the plaintiffs' checks were refused for insufficient funds, and the defendant charged the plaintiffs a returned-item fee of $15 each, totaling $60.  Later in September, the defendant waived the returned-item fees, and in October, the defendant returned the funds to the plaintiffs' account and waived interest charges incurred pursuant to the overdraft protection line of credit.  

Matthew Liebheit, the defendant's assistant branch manager in September 2000, testified that the defendant did not notify the plaintiffs that it withdrew the funds.  Matthew testified that when Donna came to the bank to inquire about the funds withdrawn from her account, Matthew and Donna completed an affidavit requesting an investigation and asserting that the defendant had transferred the funds from the plaintiffs' account without their authorization.  After sending the affidavit to the defendant's automated clearinghouse department in St. Louis, Matthew notified Donna that because her employment had been terminated in April, and pursuant to Northern Trust's request, the defendant had returned the funds to Famous Barr.  Matthew requested written documentation to document the legality of withdrawing the funds without the plaintiffs' written permission.  

Matthew testified that the defendant received a letter, dated September 8, 2000, from the plaintiffs' attorney requesting that the funds be returned to the plaintiffs' account by 4 p.m. that day.  Matthew forwarded that letter to Chrystal Riley-Stark, the defendant's vice president.  Later that day, Chrystal contacted Matthew and told him that "everything looked fine" so there was really nothing the defendant could do.  Matthew then called the plaintiffs' attorney and told him that the defendant had refused to return the funds to the plaintiffs' account.  Matthew testified that he thought he would have called the plaintiffs to notify them when the money was redeposited and to apologize for the mistake.  Matthew testified that he did not know whether the defendant changed its procedure to avoid a recurrence of the plaintiffs' situation.

Chrystal Riley-Stark testified that although Matthew had contacted her in September 2000 regarding the plaintiffs' customer complaint, she did not give Matthew a legal opinion regarding the transfer of funds from the plaintiffs' account.  Chrystal did not recall receiving a letter from the plaintiffs' attorney that had been forwarded by Matthew.  Chrystal did not remember whom she told Matthew to phone and did not remember giving Matthew a phone number.  Chrystal acknowledged that in her deposition she testified that she had directed Matthew to the automated clearinghouse department.  Chrystal testified that receiving a letter from one of the defendant's branches, taking it to the legal department for review, and then advising the individual who had sent the letter of the legal department's position was not something she would normally do.  Chrystal also did not recall calling Matthew to advise him that the funds had been returned to the plaintiffs' account.

Donna testified that she had not been notified of the problem with the checking account until she received a letter from the defendant indicating that four checks had been returned for insufficient funds.  At that time, she went to the bank and spoke with Matthew.  Donna testified that Matthew told her to complete the affidavit of unauthorized transfer to send to the defendant's automated clearinghouse department for investigation.  At that time, Matthew removed the returned-item fees for the checks returned for insufficient funds.  Donna told Matthew that she was very upset and frustrated.  Matthew subsequently advised Donna that Northern Trust had notified the defendant that Donna's employment had been terminated, which was the basis for the withdrawal of the funds.  Matthew told Donna to call Chrystal.  Donna left two messages on Chrystal's voice mail, but Chrystal did not return Donna's phone calls.  Between September 5 and October 6, 2000, the defendant charged the plaintiffs interest of $100 on the overdraft protection line of credit.  Donna testified that she cashed a credit card check to put funds into their account to pay bills.

Donna testified that in October 2000, after she and Steve had filed their lawsuit, Becky Shannon from Famous Barr notified her that it had returned the funds to her account.  Donna testified that the defendant did not call to notify her that on October 8, 2000, the defendant had returned the funds to the plaintiffs' account, including the $3,500 from the overdraft protection line of credit.  The defendant also waived the interest charges incurred.

Steve testified that his paychecks are also deposited into his and Donna's checking account.  After the defendant withdrew the funds from the plaintiffs' account, Steve spoke with Matthew concerning the problem, and Matthew indicated that Donna's employment had been terminated.  Steve was very upset after speaking with Matthew.

For the defense, Becky Shannon, Donna's supervisor at Famous Barr, testified that she notified Donna in April 2000 that Donna had exhausted her sick pay benefits and her family medical leave benefits, that during Donna's leave for her non-work-related surgery scheduled for April 21, 2000, Donna would not receive her salary, and that Donna's last paycheck would be dated April 30, 2000.  On April 21, 2000, Becky instructed her secretary to change Donna's status to an unpaid leave of absence.  Becky testified that she spoke with Donna in July but was unaware that Donna was still receiving sick pay and testified that she did not tell Donna that the check in July was the last check Donna would receive.  Becky testified that in late August, during a routine audit, Becky learned that Donna was receiving her salary, and Becky notified the payroll department.  In October, Becky phoned Donna to notify her that Famous Barr had deposited the money back into her account.  Donna inquired whether she must repay Famous Barr, and Becky answered that she did not know.

Brian Duffy, divisional vice president at Famous Barr, testified that in April 2000, he  also notified Donna that her sick pay benefits had expired and that her pay would be suspended during the last week of April.  Although Donna was not vested and had not earned her vacation pay, Brian made an exception and directed that Donna receive funds for two weeks' vacation in the month of May, but Donna was not entitled to her vacation pay and her salary.  During a routine payroll audit in late August, Brian realized that Donna was still being paid, and he notified the payroll department.  Brian identified a September 12, 2000, letter he wrote to Donna notifying her that she had been overpaid and that she should submit a check to Famous Barr or discuss a repayment arrangement.  In October 2000, when Brian learned that Famous Barr had withdrawn funds from the plaintiffs' bank account, he contacted the director of payroll and requested that Famous Barr return the funds to the plaintiffs' account.  

Donna testified that she had worked for Famous Barr for 18 years and had not been terminated.  She advised Famous Barr four to six weeks in advance that she would be having a knee replacement surgery for a non-work-related injury.  One week before Donna's surgery, Becky notified her that she had no sick pay benefits remaining.  Donna disagreed with Becky and requested to speak with Brian Duffy, Becky's supervisor, who also told Donna that she had exhausted her sick days.  Brian told Donna that they would pay her two weeks' vacation, which she received in the mail in May 2000.  Donna continued to believe she had remaining sick pay benefits and was entitled to her salary and two weeks' vacation pay.  Donna testified that Becky called her in late July to discuss her work release and that Becky told her that the end-of-July check would be her last.  

Donna testified that even though she was told in April that she would not receive her salary in May, June, July, and August 2000, she did not call Famous Barr to notify it that she received direct deposits during that time.  She explained that she believed that Famous Barr had recognized its error and decided to pay her salary.  

The defendant's net income in 2000 was $2.9 billion.

At the jury instruction conference, the defendant objected to the plaintiffs' verdict form, which used the language "We, the jury, find for [the plaintiffs] and against [the defendant]" and allocated space for the value of funds transferred, emotional damages, punitive damages, and loss-of-use damages, on the basis that the jury would be unable to determine whether it was awarding damages for conversion or for a breach of contract.  The trial court allowed the plaintiffs' verdict form over the defendant's objection.  The defendant also argued that the plaintiffs had failed to plead allegations to support an award for emotional distress.

The trial court directed a verdict in favor of the plaintiffs on their breach-of-contract claim.  The jury returned the verdict form "find[ing] for [the plaintiffs] and against [the defendant]."  The jury assessed damages of $283,682.80, which were itemized as follows:

1.  The value on September 5, 2000, of the funds transferred from the plaintiffs' checking account: $5,682.80. 

2.  Compensation for the loss of the use of the money transferred from the plaintiffs' checking account: $8,000.

3.  Emotional distress experienced by Donna Cruthis: $10,000.

4.  Emotional distress experienced by Steve Cruthis: $10,000.

5.  Punitive damages: $250,000.

On September 17, 2002, the trial court entered a judgment in favor of the plaintiffs in the amount of $283,682.80 plus costs.

On October 10, 2002, the plaintiffs filed a motion to enter a judgment for the defendant's violation of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 
et seq.
 (West 2002)), a claim to be decided by the court as a nonjury matter.  See
 Falcon Associates, Inc. v. Cox
, 298 Ill. App. 3d 652, 662 (1998).  On December 12, 2002, the trial court entered a judgment in favor of the defendant on the plaintiffs' consumer fraud claim, holding that the plaintiffs had failed to present evidence that the defendant's failure to follow the terms of the overdraft protection line of credit agreement was a deceptive practice, as opposed to a simple breach of contract.  On December 18, 2002, the plaintiffs filed a posttrial motion with respect to this order.

On February 4, 2003, the trial court entered a judgment notwithstanding the verdict in favor of the defendant on the issue of punitive damages.  The trial court found that the plaintiffs did not have a right to the direct deposits and that, therefore, it was not willful and wanton for the defendant to return the deposits to the rightful owner.  In its order, the trial court stated:

"The evidence in this case when viewed in its light most favorable to the [p]laintiffs establishes at best a basic conversion claim, nothing more.  That at most, the evidence shows a lack of good judgment by [the defendant] in withdrawing the direct deposits from the [p]laintiffs' checking account.  There was no evidence that [the defendant] engaged in the practice of withdrawing funds from their [
sic
] customers' accounts without their permission or authorization.  There was no evidence that [the defendant] benefited in any way by returning the funds to Famous Barr."  

The trial court denied the defendant's remaining requests in its posttrial motion and denied the plaintiffs' posttrial motion.  The plaintiffs filed their timely notice of appeal, and with this court's permission, the defendant filed its late notice of cross-appeal.

ANALYSIS

Judgment Notwithstanding the Verdict/Punitive Damages

The plaintiffs argue that the trial court erred in entering a judgment notwithstanding the verdict in favor of the defendant on the issue of punitive damages because the jury properly awarded them punitive damages based on their conversion claim.  The defendant counters that it was entitled to a judgment notwithstanding the verdict because the plaintiffs did not prove essential elements of their conversion claim and because its conduct was not willful and wanton.

A court should enter a judgment notwithstanding the verdict only when the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favored the movant that no contrary verdict could possibly stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510 (1967).  A judgment notwithstanding the verdict is inappropriate where "reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented."  
Pasquale v. Speed Products Engineering
, 166 Ill. 2d 337, 351 (1995).  We review 
de novo
 the trial court's judgment notwithstanding the verdict on the issue of punitive damages.  
Pedrick
, 37 Ill. 2d at 510; 
Medow v. Flavin
, 336 Ill. App. 3d 20, 35 (2002).

Punitive damages are not awarded as compensation but serve instead to punish the wrongdoer and to deter that party and others from committing similar acts of wrongdoing in the future.  
Loitz v. Remington Arms Co.
, 138 Ill. 2d 404, 414 (1990); 
Deal v. Byford
, 127 Ill. 2d 192, 203 (1989); 
Kemner v. Monsanto Co.
, 217 Ill. App. 3d 188, 197 (1991).  "Because of their penal nature, punitive damages are not favored in the law, and courts must be cautious in seeing that they are not improperly or unwisely awarded.  [Citations.]"  
Deal
, 127 Ill. 2d at 203-04. 

Conversion

The defendant argues that the evidence at the trial demonstrated that Donna was not entitled to receive the direct deposits from Famous Barr because she was on an unpaid leave of absence at the time the payroll funds were deposited into her account and that, therefore, the plaintiffs' conversion claim fails, 
i.e.
, the plaintiffs failed to prove that they had an absolute and unconditional right to the immediate possession of the property.  We disagree.

"[G]enerally, punitive damages are not available in actions for breach of contract because a party suing for breach of contract is entitled only to the benefit of his bargain and the purpose of awarding damages is to place the injured party in the position he would have been had it not been for the breach [citation]."  
Koehler v. First National Bank of Louisville
, 232 Ill. App. 3d 679, 683 (1992).  However, punitive damages are recoverable where the breach constitutes an independent tort, such as conversion.  
Cirrincione v. Johnson
, 184 Ill. 2d 109, 114 (1998); 
Kelsay v. Motorola, Inc.
, 74 Ill. 2d 172, 187 (1978); 
Koehler
, 232 Ill. App. 3d at 683-84. 

Conversion is an unauthorized act that deprives a person of his property permanently or for an indefinite time.  
In re Thebus
, 108 Ill. 2d 255, 259 (1985).  "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held."  
Bender v. Consolidated Mink Ranch, Inc.
, 110 Ill. App. 3d 207, 213 (1982).  "It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use.  [Citation.]"  
In re Thebus
, 108 Ill. 2d at 261.  To prove the tort of conversion, "a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property.  [Citation.]"  
Cirrincione
, 184 Ill. 2d at 114.  Illinois courts have sustained a plaintiff's cause of action for conversion against his or her bank.  
Roderick Development Investment Co. v. Community Bank of Edgewater
, 282 Ill. App. 3d 1052 (1996); 
Tri State Bank of East Dubuque v. Colby
, 141 Ill. App. 3d 807 (1986) (a bank committed conversion when it froze its customers' entire savings account, with funds over $9,000, when it had not yet accelerated the notes due it, as required by contract, and the customers' matured debt was only $3,000).  

In the present case, the jury properly found that the defendant wrongfully converted the plaintiffs' funds.  When Famous Barr voluntarily transferred the funds to the plaintiffs' account, Famous Barr created a debtor-creditor relationship between it and the plaintiffs.  See 
General Motors Corp. v. Douglass
, 206 Ill. App. 3d 881, 892 (1990) (a debtor-creditor relationship was created when General Motors Corp. mistakenly overpaid its dealer).  Although the plaintiffs were alleged debtors of Famous Barr, the plaintiffs maintained their right to the funds in their bank account with the defendant and their absolute and unconditional right to the immediate possession of the funds.  Mutuality allows a bank to offset debts owed by the depositor to the bank (see 
Symanski v. First National Bank of Danville
, 242 Ill. App. 3d 391, 396-97 (1993)), but the bank may not offset debts owed by the depositor to third parties (see 
Highsmith v. Department of Public Aid
, 345 Ill. App. 3d 774, 779 (2004) (even in a garnishment action, a creditor does not have the automatic right to garnish the funds of a debtor on deposit in a joint account)).  The plaintiffs had a right to the funds in their bank account, had the absolute and unconditional right to the immediate possession of the funds in their account, and made a demand for possession, and the defendant wrongfully and without authorization assumed control, dominion, or ownership over the plaintiffs' property.  See 
Cirrincione
, 184 Ill. 2d at 114.  The evidence supported the plaintiffs' conversion cause of action against the defendant, thereby establishing an independent tort for which punitive damages may be awarded.

Willful and Wanton Conduct

The defendant argues that even if the plaintiffs proved their claim of conversion, punitive damages were improperly awarded because the defendant did not act in a willful and wanton manner.  We agree.

While the question of whether punitive damages can be awarded for a particular cause of action is a matter of law (
Loitz
, 138 Ill. 2d at 414), the question of whether the defendant's conduct was sufficiently willful or wanton to justify the imposition of punitive damages is for the jury to decide (
Smith v. Hill
, 12 Ill. 2d 588, 595 (1958)).   

In 
Kelsay v. Motorola, Inc.
, the Illinois Supreme Court stated:

"It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others [citation].  Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future.  [Citation.]"  
Kelsay
, 74 Ill. 2d at 186.

Similarly, in 
Loitz v. Remington Arms Co.
, the Illinois Supreme Court stated:

" 'Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate–which is to say, conduct involving some element of outrage similar to that usually found in crime.  The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others.'  (Restatement (Second) of Torts §908, comment 
b
, at 464-65 (1979).)"  
Loitz
, 138 Ill. 2d at 415-16.

Willful and wanton misconduct approaches the degree of moral blame associated with intentional harm because the defendant deliberately inflicts a highly unreasonable risk of harm upon another in conscious disregard of it.  
Loitz
, 138 Ill. 2d at 416.  Punitive damages should not be awarded for mere inadvertence, mistake, errors of judgment, and the like, which constitute ordinary negligence.  
Loitz
, 138 Ill. 2d at 415; 
Kohlmeier v. Shelter Insurance Co.
, 170 Ill. App. 3d 643, 658 (1988).  

When viewed in the light most favorable to the plaintiffs, the evidence at the trial revealed that the defendant withdrew funds from the plaintiffs' checking account solely on an unsupported request from another bank and that the defendant did not notify or gain permission from the plaintiffs to withdraw the funds or to trigger the plaintiffs' overdraft protection line of credit.  When Donna questioned the defendant, it refused to return the funds to the plaintiffs' account and indicated that the funds had been withdrawn because she had been terminated from her employment, which was incorrect.  It is unclear whether the defendant attempted to determine whether its actions were proper or legal. 

However, we agree with the trial court that the evidence demonstrated the defendant's lack of good judgment, not willful and wanton conduct, when it withdrew the funds from the plaintiffs' account and returned them to Famous Barr.  See
 Kohlmeier
, 170 Ill. App. 3d at 658 (punitive damages cannot be awarded to punish or to deter actions simply because of an error in judgment).  Although the defendant did not notify the plaintiffs before it withdrew the plaintiffs' funds and the plaintiffs incurred returned-item fees, when the plaintiffs approached the defendant, the defendant credited the plaintiffs' account for the returned-item fees and ultimately credited the plaintiffs' account for interest charges incurred from the overdraft protection line of credit.  Although the evidence supported the jury's determination that the defendant committed conversion, it did not support the jury's determination that the defendant behaved with an evil motive or with reckless indifference to the plaintiffs' rights.  See 
Loitz
, 138 Ill. 2d at 415-16.  Accordingly, the evidence, when viewed in the light most favorable to the plaintiffs, so overwhelmingly favored the defendant that the award of punitive damages could not stand (see 
Pedrick
, 37 Ill. 2d at 510), the trial court properly granted a judgment notwithstanding the verdict on the issue of punitive damages, and we affirm its judgment on this issue.

Consumer Fraud and Deceptive Business Practices Act

The plaintiffs also argue that the trial court erred in finding in favor of the defendant and against the plaintiffs on their claim under the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 
et seq.
 (West 2002)).

The elements of a cause of action under the Consumer Fraud and Deceptive Business Practices Act are (1) a deceptive act or practice by the defendant, (2) an intent that the plaintiff rely on the deception, and (3) the deception occurred in the course of conduct involving trade or commerce.  815 ILCS 505/2 (West 2002); 
Connick v. Suzuki Motor Co.
, 174 Ill. 2d 482, 501 (1996).  A jury is not authorized to render a judgment for a violation of the Consumer Fraud and Deceptive Business Practices Act.  
Falcon Associates, Inc.
, 298 Ill. App. 3d at 662.  We disturb the trial court's judgment, entered pursuant to a bench trial, only when it is contrary to the manifest weight of the evidence.  
Bazydlo v. Volant
, 164 Ill. 2d 207, 215 (1995); 
Jackson v. Bowers
, 314 Ill. App. 3d 813, 818 (2000).  A trial court's judgment is contrary to the manifest weight of the evidence only when an opposite conclusion is apparent or when its findings appear to be unreasonable, arbitrary, or not based on the evidence.  
Bazydlo
, 164 Ill. 2d at 215.

The Consumer Fraud and Deceptive Business Practices Act was not intended to extend to every transaction between contracting parties.  
Bankier v. First Federal Savings & Loan Ass'n of Champaign
, 225 Ill. App. 3d 864, 874 (1992).  "[T]he Act is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to address a purely private wrong.  [Citation.]"  
Bankier
, 225 Ill. App. 3d at 875.

The plaintiffs argue that the defendant committed the following two deceptive acts:

1.  The defendant represented in its account agreement that the account would be governed by the defendant's account rules and regulations, the evidence of account, and applicable federal and state laws and regulations.

2.  The defendant represented that the overdraft protection line of credit would be triggered only when a check was presented for payment and there was an insufficient balance in the plaintiffs' checking account.

The defendant's unauthorized removal of the funds from the plaintiffs' account, including its activation of the overdraft protection line of credit, was an individual, isolated incident, was a purely private wrong between two parties, and did not affect consumers generally.  See 
Bankier
, 225 Ill. App. 3d at 875.  The plaintiffs and the defendant disagreed about the interpretation of the contract in question, 
i.e.
, whether the contract allowed the defendant to withdraw funds previously deposited by a third party into the plaintiffs' account and to trigger the plaintiffs' overdraft protection line of credit.  See 
Bankier
, 225 Ill. App. 3d at 875.  The plaintiffs' theory of the defendants' deceptive practice was far-fetched, 
i.e.
, the plaintiffs argued that the defendant, who was in the business of banking, agreed to hold their money in their account and receive direct deposits with the intent to breach that agreement to allow a third party to gain from the plaintiffs' loss.  See 
Exchange National Bank v. Farm Bureau Life Insurance Co. of Michigan
, 108 Ill. App. 3d 212, 215 (1982).  The trial court properly found in favor of the defendants and rejected the plaintiffs' claim pursuant to the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 
et seq.
 (West 2002)), and we affirm the trial court's judgment on this issue.

Emotional Distress Damages

On cross-appeal, the defendant argues that the trial court erred in permitting the jury to award damages for emotional distress, because the plaintiffs did not plead or provide evidence to support a cause of action for emotional distress.  The plaintiffs counter that the defendant waived this issue by failing to provide an alternate verdict form that omitted emotional distress damages as an award.  

During the jury instruction conference and in its posttrial motion, the defendant objected that the verdict form erroneously included emotional distress as an element of recovery, and we will address the defendant's argument.  See 
In re Marriage of Sutton
, 136 Ill. 2d 441, 446 (1990) (waiver is a limitation on the parties and not on the court).

In 
Sloan v. Jasper County Community Unit School District No. 1
, 167 Ill. App. 3d 867, 869 (1988), the defendant argued that the plaintiff's emotional distress was an element of the separate tort of "intentional infliction of emotional distress," which should have been pleaded in a separate count.  This court, however, rejected the defendant's argument and held that pain, suffering, embarrassment, and humiliation were among the elements of damage the plaintiff claimed to have suffered as a result of the retaliatory discharge and violation of his constitutional rights.  
Sloan
, 167 Ill. App. 3d at 870.  This court stated:

"Although we have found no authority on point, we know of no reason why the type of damages available in retaliatory discharge cases should be more limited than those available in any other tort actions.  There can be no serious question that the damages sought by plaintiff here could be recovered under Illinois law in such actions."  
Sloan
, 167 Ill. App. 3d at 870.

In 
Eick v. Perk Dog Food Co.
, 347 Ill. App. 293, 299-301 (1952), the court noted that plaintiffs have been awarded substantial damages in traditional tort cases, 
i.e.
, assault, battery, trespass, false imprisonment, defamation, and criminal conversion, where damages to reputation, physical integrity, or pecuniary interests were so slight that mental suffering was the real basis of recovery.  See 
Petty v. Chrysler Corp.
, 343 Ill. App. 3d 815, 828 (2003) (damages for mental suffering and distress could be expected and constitute actual damages in misappropriation-of-identity cases); see also Restatement (Second) of Torts §927, Comment 
m
 (1979) (with respect to a judgment for the conversion of a chattel, if the deprivation is the legal cause of harm to the feelings, damages may be allowable for the harm).

In the present case, the plaintiffs did not allege that the defendant committed the independent tort of intentional infliction of emotional distress, and they need not have done so.  See 
Sloan
, 167 Ill. App. 3d at 869-70.  Instead, the plaintiffs sought damages for emotional distress, which may be recovered from a defendant who committed the intentional tort of conversion.  Accordingly, we affirm the jury's award for the plaintiffs' emotional distress as a result of the defendant's conversion of their funds.

Jury Instructions

The defendant also argues that it was entitled to a new trial because the verdict form  failed to separate the damages recoverable for a breach of contract from the damages recoverable for a conversion.  The plaintiffs counter that the defendant waived this issue because it failed to object and failed to tender an alternate instruction to the verdict form, thereby depriving the trial court and the plaintiffs of the opportunity to address the proposed instruction and obviate any alleged defect.  We agree.  

Although the defendant stated that the verdict form was confusing, it failed to demand separate awards at the time of the trial.  The defendant tendered forms for defense verdicts but failed to tender an alternate instruction for the verdict form that it now claims was improper.  If the defendant desired to ascertain upon which counts the jury would return its verdict, it could have done so by submitting a separate verdict form for each count, and not having done so, it cannot now complain.  See 
Moore v. Jewel Tea Co.
, 46 Ill. 2d 288, 294 (1970).  By its omission, the defendant has waived its right to do so.  See 
Saldana v. Wirtz Cartage Co.
, 74 Ill. 2d 379, 387 (1978) (to preserve an objection to a jury instruction, one must tender a proper instruction); 
Powers v. Sturm
, 12 Ill. App. 3d 346, 350 (1973); 155 Ill. 2d R. 366(b)(2)(i) (no party may raise on appeal the failure to give an instruction unless the party tendered it).   

Loss-of-Use Damages

The defendant also argues that the trial court should have entered a judgment notwithstanding the verdict with respect to the jury's award of $8,000 for one month's loss of the use of the funds, because the award bore no reasonable relationship to the evidence of the loss suffered.   

In Illinois, the question of damages is peculiarly one of fact for the jury.  
Baker v. Hutson
, 333 Ill. App. 3d 486, 493 (2002).  We will not overturn a jury's award of damages unless it is against the manifest weight of the evidence or palpably erroneous.  
Washington Courte Condominium Ass'n-Four v. Washington-Golf Corp.
, 267 Ill. App. 3d 790, 822-23 (1994).  The jury's determination of damages is entitled to substantial deference; however, the jury's award must bear a reasonable relationship to the loss suffered.  
Snover v. McGraw
, 172 Ill. 2d 438, 447 (1996).  Otherwise, it is palpably erroneous and must be set aside as excessive.  
Washington Courte Condominium Ass'n-Four
, 267 Ill. App. 3d at 822-23.

The law recognizes an award of damages for conversion based on the reasonable value of the use of the property during the period of wrongful detention.  
Crosby v. City of Chicago
, 11 Ill. App. 3d 625, 628 (1973).  Such an award, however, is predicated on the existence and proof of evidence that discloses a reasonable rental or use value of the converted property.  
Barrelett v. Bellgard
, 71 Ill. 280, 282 (1874).  It is the plaintiff's burden to prove the value of property converted, and the evidence must afford some reasonable and proper basis for ascertaining the value.  
Long v. Arthur Rubloff & Co.
, 27 Ill. App. 3d 1013, 1026 (1975).  At a minimum, the evidence must rise to the dignity of proof and supply standards for measuring value to enable the trier of fact to exercise its judgment.
  Long
, 27 Ill. App. 3d at 1026.

In the present case, the defendant credited the plaintiffs' account for the amount withdrawn, for the overdraft protection line of credit interest charges, and for the returned-item fees; thus, the plaintiffs incurred no interest charges or fees as a result of the defendant's withdrawal, and subsequent redeposit, of their funds.  Although the evidence demonstrated that Donna acquired a cash advance on her credit card to pay the bills during the month that the funds were not in the plaintiffs' account, the plaintiffs failed to present evidence regarding the amount charged to the credit card or whether the plaintiffs incurred interest charges, 
i.e.
, whether they paid the amount due the credit card when the funds were returned to their account and before finance charges were incurred.  The plaintiffs also failed to introduce evidence regarding the amount of interest lost as a result of the defendant's conversion of their funds.  As a result, the jury's $8,000 damage award for loss of use bore no reasonable relationship to the evidence of the loss suffered (see 
Snover
, 172 Ill. 2d at 447; 
Long
, 27 Ill. App. 3d at 1025) and was against the manifest weight of the evidence.  We therefore reverse the jury's award of damages for loss of use.

[Nonpublishable material under Supreme Court Rule 23 (166 Ill. 2d R. 23) removed here.]

CONCLUSION

We affirm that portion of the trial court's judgment granting a judgment notwithstanding the verdict in favor of the defendant on the issue of punitive damages, we affirm that portion of the trial court's judgment finding in favor of the defendant on the plaintiffs' consumer fraud claim, we affirm the jury's award of damages for emotional distress, and we affirm that portion of the trial court's judgment directing a verdict in favor of the plaintiffs on their breach-of-contract action, but we reverse the jury's award of damages for loss of use.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed in part and reversed in part.  

Affirmed in part and reversed in part. 

KUEHN and DONOVAN, JJ., concur.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 12/01/04.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.